ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| DAVID RONALD ALLEN, | : |
| WILLIAM F. BURBANK IV, | : |
| ALEX DOWLATSHAHI, | : |
| ILYA DRAPKIN, | : |
| CHRISTOPHER MILLS, | : |
| GERALD PATERA, | : |
| ROBERT WILSON, | : |
| ASSOCIATES FUNDING GROUP, INC., | : |
| CAPITAL BANKERS GROUP, LTD., | : |
| CHINA VOICE HOLDING CORP., | : |
| DEVELOPMENT CAPITAL ASSOCIATES JOINT | : |
| VENTURE, | : |
| INTEGRITY DRIVEN NETWORK CORP., | : |
| LUCRATIVE ENTERPRISES, CORP., | : |
| MG TK CORP., | : |
| SILVER SUMMIT HOLDINGS, LLC, | : |
| SLEEPING BEAR, LLC, | : |
| STRATEGIC CAPITAL, | : |
| SYNERGETIC SOLUTIONS, LLC, | : |
| THIRD SECURITIES CORP., | : |
| AND TOWNHOME COMMUNITIES CORP., | : |
| | : |
| Defendants, | : |
| | : |
| and | : |
| | : |
| PATRICIA ALLEN, | : |
| COMMUNITY OF PLEASANT RIDGE, LTD., | : |
| DARIUS ASSETS HOLDING CORP. | : |
| DEBT MANAGEMENT ASSOCIATES, Ltd. | : |
| D-CAP II PARTNERS, LTD., | : |
| D-CAP III PARTNERS, LTD., | : |
| D-CAP IV PARTNERS, LTD., | : |
| D-CAP V PARTNERS, LTD., | : |

3-11CV-882-0

Civil Action No.:

D-CAP VI PARTNERS, LTD.,                    :
D-CAP VII PARTNERS, LTD.,                   :
D-CAP VIII PARTNERS, LTD.,                  :
D-CAP IX PARTNERS, LTD.,                    :
D-CAP X PARTNERS, LTD.,                     :
D-CAP XI PARTNERS, LTD.,                    :
D-CAP XII PARTNERS, LTD.,                   :
D-CAP XIII PARTNERS, LTD.,                  :
D-CAP XIV PARTNERS, LTD.,                   :
D-CAP XV PARTNERS, LTD.,                    :
D-CAP XVI PARTNERS, LTD.,                   :
D-CAP XVII PARTNERS, LTD.,                  :
GREEN HORSESHOE HOLDINGS, INC.,            :
SMI CHIPS, INC.,                            :
AND WINTERSTONE FINANCIAL, LTD.           :
                                           :
                      **Relief Defendants.**  :
                                           :
_____     :

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The Securities and Exchange Commission ("Commission"), Plaintiff, files this

Complaint against Defendants and Relief Defendants and alleges as follows:

## SUMMARY

1.      Two weeks after China Voice Holding Corp. ("China Voice") publicly

disclosed that it was under investigation by the Commission, David Ronald Allen

("Allen"), the co-founder, Chief Financial Officer and holder of all the Series A preferred

stock of the company, launched  a *Ponzi* scheme, which is still on-going today and

proceeds of which have benefited China Voice, Allen and others.  This on-going *Ponzi*

scheme is merely the current iteration of a more than four-year, multi-million dollar,

evolving fraudulent scheme perpetrated by China Voice, Allen, China Voice's former-

CEO William F. Burbank IV ("Burbank"), a host of Allen-related entities and other

individuals and entities.  Allen has obfuscated these frauds, including the *Ponzi* scheme,

by creating, and funneling money through, a complicated web of at least 28 companies and other entities that he controls.

2. Since at least 2006, China Voice, Allen, Burbank and others have made false and misleading public statements about China Voice, to maintain the façade of a prosperous company, while masking the unjust enrichment of the principals. Among other things, investors have been misled concerning China Voice's business opportunities and sources of capital and by material omissions concerning negative business information and the true nature of the company's debt and the support it obtained from loans. Meanwhile, two major stockholders perpetuated these false and misleading statements in widespread, stock promotion campaigns to generate interest in the stock while they engaged in self-dealing and sold their stock into the artificially high stock price they helped create.

3. In the latest scheme, initiated in November 2008, and continuing through the present, at least sixteen investment entities in the form of limited partnerships managed by Allen, Alex Dowlatshahi ("Dowlatshahi"), and Christopher Mills ("Mills") have raised more than $8.6 million from investors through fraudulent offerings. Potential investors in these investment entities (the "limited partnerships") were promised rates of return of at least 25% to be paid within one year with "minimal risk." Defendants misrepresented to investors that these rates were achievable because their funds would be used to make asset-based loans to unnamed companies "with a demonstrated track record," large profit margins, and which "have been unable to realize needed funding levels because of the unavailability of traditional financing."

4.      Contrary to the defendants' representations about the use of the proceeds, they paid early investors from funds invested in later limited partnerships in classic *Ponzi* fashion.  Although some investor funds were used to make payments to businesses, all of them were to companies associated with Allen or his associates, including China Voice, which did not have a "demonstrated track record" or large profit margins. In addition, some funds went to defendants either directly or through nominees, including Allen's wife.

5.      In order to maintain the scheme, Allen, Dowlatshahi, and Mills have increased the pace at which they are establishing new limited partnerships and have generally increased the size of the offerings, ensuring a steady stream of proceeds from defrauded investors.  The Commission is aware that Allen, Dowlatshahi, and Mills are planning or have already begun to solicit funds from investors for at least two more limited partnerships.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), (e), 78u-1, and 78aa].  Defendants, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, practices, and courses of business described in this Complaint.  Venue is proper because certain of the transactions, acts, practices, and courses of business described below occurred within the jurisdiction of the Northern District of Texas.

## DEFENDANTS

7.      **David Ronald Allen**, age 60, resides in Dallas, Texas.  He is the co-founder and former Chief Financial Officer of China Voice.  He is a director, officer, registered agent, and/or managing member of Associates Funding Group, Inc., Community of Pleasant Ridge, Ltd., Debt Management Associates, Ltd., Development Capital Associates Joint Venture, D-Cap II Partners, Ltd., D-Cap III Partners, Ltd., D-Cap IV Partners, Ltd., D-Cap V Partners, Ltd., D-Cap VI Partners, Ltd., D-Cap VII Partners, Ltd., D-Cap VIII Partners, Ltd., D-Cap IX Partners, Ltd., D-Cap X Partners, Ltd., D-Cap XI Partners, Ltd., D-Cap XII Partners, Ltd., D-Cap XIII Partners, Ltd., D-Cap XIV Partners, Ltd., D-Cap XV Partners, Ltd., D-Cap XVI Partners, Ltd., D-Cap XVII Partners, Ltd., Integrity Driven Network Corp., Townhome Communities Corp., and Winterstone Financial, Ltd.

8.      **William F. Burbank, IV**, age 52, resides in Delray Beach, Florida.  He is the former Chairman and Chief Executive Officer of China Voice.

9.      **Alex Dowlatshahi,** age 36, resides in Dallas, Texas.  He is the director, officer, and/or managing member of Development Capital Associates Joint Venture, Integrity Driven Network Corp., Lucrative Enterprises, and Synergetic Solutions, LLC.  Dowlatshahi is the subject of a desist and refrain order by the State of California Business, Transportation, and Housing Agency Department of Corporations prohibiting him from buying, offering, or selling securities in California as a result of his role in an offering fraud in that state in 2006.

10.     **Ilya Drapkin**, age 64, resides in Dallas, Texas.  He is the director, officer, and/or managing member of MG TK Corp. and SMI Chips, Inc.

11.     **Christopher Mills,** age 34, resides in McKinney, Texas.  He is the officer, director, and/or managing member of Development Capital Associates Joint Venture, Integrity Driven Network Corp., Silver Summit Holdings, LLC, and Sleeping Bear, LLC.

12.     **Gerald Patera**, age 69, resides in Pinehurst, North Carolina.  He is the officer, director, and/or managing member of Capital Bankers Group, Ltd. and Third Securities Corp.

13.     **Robert Wilson**, age 42, resides in Dallas, Texas.  He is the officer, director, and/or managing member of Green Horseshoe Holdings, Inc. and Strategic Capital.

14.     **Associates Funding Group, Inc.** is a Texas corporation formed and controlled by Allen.

15.     **Capital Bankers Group, Ltd.** is a Michigan corporation formed by Patera.

16.     **China Voice Holding Corp.** is a Nevada corporation headquartered in Boca Raton, Florida.  Since December 29, 2008, China Voice Holding Corp.'s common stock has been registered with the Commission pursuant to Section 12 of the Exchange Act and trades over the counter.

17.     **Development Capital Associates Joint Venture** is a Texas joint venture controlled and operated by Allen, Dowlatshahi, and Mills.  It is the general partner of D-Cap II Partners, Ltd., D-Cap III Partners, Ltd., D-Cap IV Partners, Ltd., D-Cap V Partners, Ltd., D-Cap VI Partners, Ltd., D-Cap VII Partners, Ltd., D-Cap VIII Partners, Ltd., D-Cap IX Partners, Ltd., D-Cap X Partners, Ltd., D-Cap XI Partners, Ltd., D-Cap

XII Partners, Ltd., D-Cap XIII Partners, Ltd., D-Cap XIV Partners, Ltd., D-Cap XV

Partners, Ltd., D-Cap XVI Partners, Ltd., and D-Cap XVII Partners, Ltd.

18.     **Green Horseshoe Holdings, Inc.** is a Texas corporation formed and

controlled by Wilson.

19.     **Integrity Driven Network Corp.** is a Texas non-profit corporation

controlled and operated by Allen, Dowlatshahi, and Mills.

20.     **Lucrative Enterprises Corp.** is a Texas corporation formed and

controlled by Dowlatshahi.

21.     **MG TK Corp.** is a Texas corporation controlled by Drapkin.

22.     **Silver Summit Holdings, LLC** is a Nevada limited liability corporation

formed and controlled by Mills.

23.     **Sleeping Bear, LLC** is a Texas limited liability corporation formed and

controlled by Mills.

24.     **Strategic Capital** is an entity of undetermined corporate status formed

and controlled by Wilson.

25.     **Synergetic Solutions, LLC** is a Nevada limited liability corporation

formed and controlled by Dowlatshahi.

26.     **Third Securities Corp.** is a Texas corporation formed and controlled by

Patera

27.     **Townhome Communities Corp.** is a Texas corporation formed and

controlled by Allen.

## RELIEF DEFENDANTS

28.    **Patricia Allen,** age 56, resides in Dallas, Texas.  She is Allen's wife and was the recipient of proceeds from misconduct at issue in this Compliant.

29.    **Community of Pleasant Ridge, Ltd.** is a Texas limited partnership.

30.    **Darius Assets Holding Corp.** is a Texas corporation formed and controlled by Dowlatshahi.

31.    **Debt Management Associates Ltd.** is a Texas limited partnership.

32.    **D-Cap II Partners, Ltd.** is a Texas limited partnership.

33.    **D-Cap III Partners, Ltd.** is a Texas limited partnership.

34.    **D-Cap IV Partners, Ltd.** is a Texas limited partnership.

35.    **D-Cap V Partners, Ltd.** is a Texas limited partnership.

36.    **D-Cap VI Partners, Ltd.** is a Texas limited partnership.

37.    **D-Cap VII Partners, Ltd.** is a Texas limited partnership.

38.    **D-Cap VIII Partners, Ltd.** is a Texas limited partnership.

39.    **D-Cap IX Partners, Ltd.** is a Texas limited partnership.

40.    **D-Cap X Partners, Ltd.** is a Texas limited partnership.

41.    **D-Cap XI Partners, Ltd.** is a Texas limited partnership.

42.    **D-Cap XII Partners, Ltd.** is a Texas limited partnership.

43.    **D-Cap XIII Partners, Ltd.** is a Texas limited partnership.

44.    **D-Cap XIV Partners, Ltd.** is a Texas limited partnership.

45.    **D-Cap XV Partners, Ltd.** is a Texas limited partnership.

46.    **D-Cap XVI Partners, Ltd.** is a Texas limited partnership.

47.    **D-Cap XVII Partners, Ltd.** is a Texas limited partnership.

48.    **SMI Chips, Inc.** is a Texas corporation formed and controlled by Drapkin.

49.    **Winterstone Financial Ltd.** is a Texas limited partnership formed and controlled by Allen.

## OTHER ENTITIES

50.    **Beijing Techview System Engineering Co., Ltd. ("Beijing Techview")**, was a network design and installation company headquartered in Beijing, China. Between August 1, 2006, and January 1, 2008, Beijing Techview was a subsidiary of China Voice.

51.    **Beijing CandidSoft Technologies Co., Ltd. ("CandidSoft")**, is an international office-automation software and technology company headquartered in Beijing, China. Between January 18, 2006, and June 30, 2010, CandidSoft was a subsidiary of China Voice.

52.    **WRIO Corp.**, is a corporation owned by Allen, that entered into a joint venture with China Voice in May 2006.

53.    **Flint Telecom Group, Inc.,** is a telecommunications and services company that entered into an agreement with China Voice in January 2009 to buy six of China Voice's domestic subsidiaries.

54.    **NTELEC Networks, LLC,** is a communications and services company that, according to a recent China Voice press release, entered into an agreement with China Voice effective October 1, 2010, under which China Voice will acquire all of NTELEC's outstanding stock. The agreement was announced on April 21, 2011, along with the resignations of Allen and Burbank from China Voice.

## FACTS

**A.**     **China Voice and Its Purported Operations in China**

55.     Until this past month, March 2011, China Voice has held itself out as conducting business in China providing next-generation communications products and services.  Through its subsidiaries, China Voice claims to provide Voice over Internet Protocol ("VoIP"), telephone services, office automation, wireless broadband, and prepaid calling card services, among other things.

56.     Since at least September 2006, the company's press releases and public filings, all of which were reviewed by Allen and Burbank, extensively publicized contracts supposedly signed by its Chinese subsidiaries to provide technology and communications services to Chinese governmental agencies and other entities in China, providing high levels of projected revenue to the company.

57.     This information was false and misleading and failed to provide material facts necessary in order to make the statements, under the circumstances, not misleading. It was not until the company began issuing audited financial statements in June 2008 that the company disclosed in its filings that a majority of the company's purported revenue came from its domestic subsidiaries, which largely sold long-distance calling cards. China Voice continued, however, to tout the Chinese contracts in its public statements.

**1.**     **Beijing Techview**

58.     In at least seven press releases in 2007, China Voice announced contracts signed by one of its Chinese subsidiaries, Beijing Techview Engineering Co. Ltd. ("Beijing Techview"), providing valuations for the contracts that totaled more than $3.5

million in revenue.  This information was material given that China Voice's revenue for the fiscal year ended June 30, 2007, was only $2.1 million.

59.     After touting the projected Beijing Techview revenue throughout 2007--including in a December 20, 2007 press release--, China Voice sold the subsidiary on January 1, 2008, for a net gain of only $73,733.  China Voice did not disclose the sale publicly until May 14, 2008, and despite losing this projected revenue, did not revise its revenue projections following the sale of Beijing Techview.

**2.     Candidsoft**

60.     Between September 19, 2006, and October 29, 2009, China Voice's press releases and public filings trumpeted purported contracts that another subsidiary, Beijing CandidSoft Technologies Co. ("CandidSoft"), had signed to install telephone and other communications software in China.  China Voice purportedly would receive money in exchange for each "seat" for which it installed this software.  A "seat" generally was comprised of an individual personal computer at an office desk on which communication and office automation applications would be loaded.

61.     According to China Voice, the number of seats it had contracted to install grew to at least 103,000, which on April 3, 2008 China Voice claimed would generate annual revenue of $37 million.  The $37 million in annual revenue was material given China Voice's current revenue as of June 30, 2007, of $2.1 million.

62.     Throughout 2006, 2007, and into 2008, China Voice continued to publicize the 103,000 seat figure.  Meanwhile, China Voice announced revisions to its contracts in China, which pushed its projected revenue higher for the current fiscal year and supposedly would cause explosive growth for the following two fiscal years.

63.     However, in a June 30, 2008 press release, China Voice announced that it had installed only 1,000 seats. Even then, Burbank, China Voice's CEO, spun the news, stating that the installation rate "should ramp up . . . in coming weeks," while referencing the "integrity" of China Voice's then projected revenues of $144.2 million for the fiscal year ending June 30, 2009, and $317.2 million for the fiscal year ending June 30, 2010.

64.     China Voice's actual revenue reported for the year ended June 30, 2009 was $751, 723 and for the year ended June 30, 2010, was $4,599,233.

65.     China Voice admitted in its quarterly report filed on February 19, 2009, that it had not installed any additional seats. In October 2009, China Voice again noted that it had installed "approximately" 1,000 seats.

66.     On March 16, 2011, in its annual report for the fiscal year ended June 30, 2010, China Voice announced that "during the year ended June 30, 2010 the Company determined that it was unable to implement its business plan in China and wrote of [*sic*] the asset value of $6,372,932."

**3.     WRIO**

67.     In August 2006, China Voice announced that it had secured exclusive distribution rights for the WRIO wireless broadband technology from WRIO Corp., a company owned by Allen. Thereafter, China Voice's "exclusive" license with WRIO was mentioned in press releases and stock promotion campaigns.

68.     In January 2007, China Voice announced that China had issued a patent for WRIO technology. According to Burbank, China Voice's CEO, this patent gave China Voice the protection it needed to aggressively pursue business partners in China,

and, after securing these partners, its Chinese subsidiaries would generate revenue through licensing and revenue sharing relationships.

69.     In June 2008, in its first audited financial statements, China Voice disclosed for the first time that WRIO belonged to an "officer and director" of the company (Allen), that China Voice had invested just $1,000 into its venture with WRIO, and that China Voice had not earned any revenues from WRIO.  Prior to that date, investors would have had no way of discerning that WRIO was not a central part of China Voice's Asian expansion, as had been represented by its CEO, but rather was a company controlled by China Voice's own CFO.

70.     Even after June 2008, China Voice continued to issue public statements about WRIO that failed to disclose the specific ties to Allen and the lack of its actual success.  In a February 19, 2009, quarterly financial report, China Voice disclosed for the first time that it had loaned WRIO $92,300.  China Voice offered no explanation as to when the loan was made, the reason for the loan, or the terms of the loan.

### 4.     Flint Telecom

71.     On January 29, 2009, China Voice announced an agreement by which it had sold six domestic operating subsidiaries, largely consisting of calling card companies, and issued 15 million common shares to Flint Telecom Group, Inc. ("Flint Telecom").  In exchange, China Voice was to receive $10 million in cash to be paid over the next two years and up to 21 million shares of Flint Telecom stock, then valued at approximately $8 million.  As part of this deal, Burbank would continue to serve as China Voice's CEO and President, while also becoming Flint Telecom's President and Chief Operating Officer.

72.     Over the next two years, China Voice, Allen, and Burbank made false and misleading statements and material omissions about the status of Flint Telecom's payments under the agreement and China Voice's use of those proceeds.

73.     These statements and omissions were material, especially in light of China Voice's announcement that the transaction would provide China Voice "with the additional capital to take advantage of synergistic opportunities in China," fund China Voice's move onto a new trading exchange, and enable China Voice to "quickly ramp up sales and to be profitable by mid-2009."

74.     Almost immediately, Flint Telecom failed to meet the schedule of payments agreed to by the two companies.  Following the announcement of the deal, China Voice was supposed to receive $2.5 million from Flint Telecom by April 30, 2009.  Instead, it received just over $340,000 by that date.  China Voice did not inform investors that any of the payment deadlines (of February 12, February 27, and March 31) had been missed prior to April 30.

75.     On April 30, 2009, China Voice announced that it agreed to amend the payment schedule with Flint Telecom, although China Voice did not disclose that these amendments were due to prior missed payments.  Flint Telecom immediately fell behind making the amended payment deadlines in April and May 2009.  China Voice also did not disclose these missed payments to investors.

76.     In June 2009, Flint Telecom obtained outside financing and made a series of payments to China Voice.  On July 1, 2009, China Voice issued a press release in which Burbank stated that while Flint Telecom "experienced some initial delays in

*SEC v. David Ronald Allen, et al.,*
Complaint                              - 14 -

receiving funding to enable payments to China Voice," Flint Telecom had overcome those obstacles and was now current.

77.     In a July 14, 2009 press release, Allen represented that with "the funds from the sale of our U.S. subsidiaries, strong presence in China," and patented software, China Voice was "poised for growth and a successful fiscal year ending June 30, 2010."

78.     Just one day later, however, on July 15, Flint Telecom missed the next scheduled payment, and it missed multiple payment deadlines thereafter.

79.     By October 2009, Flint Telecom owed China Voice $1 million under the amended agreement.  On October 19, 2009, Burbank, writing in his position as Flint Telecom's President, confirmed this debt to Allen in a private letter.  Burbank admitted that "delays in our funding initiatives have negatively impacted Flint, and we are very sorry that this has also negatively impacted CHVC [China Voice]."  China Voice did not inform investors that its major source of capital, Flint, was $1 million behind in payments or that the company had been negatively impacted as a result.

80.     On June 11, 2009, while Flint was perpetually falling behind in payments to China Voice, China Voice agreed to pay Burbank, who was simultaneously the China Voice CEO and Flint's President and Chief Operating Officer, $150,000 as a "partial payment to you in recognition and appreciation" of the Flint Telecom transaction.

81.     In a letter to Burbank on behalf of China Voice, Allen requested that Burbank pay himself by transferring funds from China Voice to Allen's Associates Funding Group, which would then transfer the funds to Burbank "so that your staff in Florida will not be aware of this additional income to you."

82.     While investors were made aware of the $150,000 bonus to Burbank, China Voice did not disclose that it was related to the Flint Telecom transaction or how badly that deal was performing. On December 31, 2009, Burbank agreed to return the bonus by making a payment of $50,000 to China Voice, and $100,000 to Flint Telecom because both companies needed the money. China Voice did not disclose that the bonus had been returned until March 16, 2011, when it filed its annual report for the fiscal year ended June 30, 2010. China Voice still has not disclosed to investors that 66% of the bonus had been transferred to Flint Telecom.

83.     Although the sale of its domestic subsidiaries to Flint Telecom was supposed to provide China Voice with the funding it needed to expand its business, investors were not informed that in reality neither company was financially sound.

84.     For example, China Voice did not disclose to investors that Flint Telecom itself was in such dire straits that it was unable to pay its officers, a fact Burbank was well aware of due to his dual positions at China Voice and Flint Telecom. Since the deal was announced on January 29, 2009, China Voice transferred nearly $50,000 to Flint Telecom, more than $300,000 to subsidiaries China Voice had sold to Flint Telecom, and at least $20,000 to Flint Telecom officers, none of which was disclosed to investors.

85.     On May 28, 2010, China Voice announced that it had executed a settlement agreement with Flint Telecom and terminated the deal. Under the agreement, Flint Telecom was to pay China Voice $1,520,242 in installments between August 31, 2010, and May 31, 2011, and return to China Voice certain subsidiaries that had been sold to Flint Telecom.

86.     China Voice did not disclose that $1 million of this settlement payment was earmarked to repay two loans to China Voice that were never reported in the company's public financial statements.

**B.**     **Stock Promotion Campaigns Financed by Allen, Patera, and Drapkin with Touting by Patera and Drapkin**

87.     The materially false and misleading statements and material omissions made by China Voice, Allen, and Burbank were not confined to the company's press releases and public filings.  Rather, they were repeated in stock promotion campaigns designed to induce stock purchases.

88.     Between July 1, 2006, and June 30, 2010, China Voice transferred at least $235,000 to investor relations firms and stock promoters for stock promotion campaigns. These efforts were supplemented by funds provided by shareholder and China Voice creditor Drapkin (at least $1.4 million), shareholder Patera (at least $250,000), and Allen (at least $98,000).

89.     Allen was aware that Drapkin and Patera were financing stock promotion campaigns.  China Voice did not disclose that Allen himself had paid for stock promotion campaigns.

90.     For example, on December 17, 2007, Allen's Associates Funding Group, Inc. ("Associates Funding Group") wired $25,000 to Expedite Holdings, Inc., which was affiliated with Expedite Ventures, the operator of at least two stock promotion internet websites.  Between October 26, 2007, and February 2, 2009, two of these websites featured China Voice at least 32 times.  These features reprinted China Voice press releases containing the false and misleading statements regarding revenue projections and

business opportunities in China. China Voice did not disclose that Allen had paid for these promotions, nor did the promotions themselves reveal that they were paid for by Allen or an Allen-owned company.

91.     On October 17, 2007, Patera and Drapkin agreed to sell into the public market 5 million shares of China Voice owned by the two men. Separately, Drapkin agreed to spend at least $500,000 on stock promotion campaigns touting China Voice, which would occur while Patera and Drapkin sold their shares.

92.     Allen was aware of this agreement at the time it was signed, knew that Drapkin and Patera intended to and did hire stock promoters, and was aware that Drapkin and Patera intended to and did sell shares of China Voice while touting the company's stock.

93.     The stock promotion campaigns paid for by Patera and Drapkin contained false and misleading statements regarding China Voice, as well as false and misleading statements regarding the details of payments for those campaigns. For example, on March 19, 2008, AllPennyStocks.com published a profile of China Voice, which included the touting of the WRIO deal. The profile did not disclose that Allen owned WRIO or that China Voice had loaned WRIO $92,300. Patera's Third Securities Corp. ("Third Securities") had wired $5,000 to AllPennyStocks.com that day to pay for this profile.

94.     From at least November 2007 through April 2008, blast faxes, essentially spam faxes sent to thousands of people at once, were distributed hyping China Voice. The disclosures on these faxes indicated that they were sent by Strategic Capital, which is owned by Robert Wilson ("Wilson").

95.     The blast faxes contained false and misleading statements about China Voice and who was paying for the faxes.  For example, the blast faxes indicated that Strategic Capital had "been hired by a third party consultant" and was contracted to receive between $70,000 and $115,000 (depending on the fax).

96.     In fact, Drapkin's MG TK Corp. ("MG TK") had transferred more than $980,000 to Wilson and his companies (Strategic Capital and Green Horseshoe Holdings, Inc.) in 2007 and 2008, and Patera had paid another $20,000.  At the time, Drapkin and Patera owned significant shares of China Voice stock.

97.     Allen also helped fund the blast fax campaign.  On April 16, 2008, an Allen-owned company transferred more than $46,000 to MG TK, which immediately wired $46,000 to Strategic Capital.

98.     At the same time they were spending over a million dollars on stock promotion campaigns touting the purchase of shares of China Voice, Patera and Drapkin dumped millions of shares of the company into the market.

99.     On March 31, 2008, at least one stock promoter, Keros Capital, issued a stock alert promoting China Voice paid for by Patera.  That same day, Patera sold 185,317 shares of China Voice for proceeds of more than $197,000.  Similarly, on October 31, 2007, at least three stock promoters (AheadoftheBulls.com, PamplonaPicks.com, and InvestSource, Inc.) featured China Voice in publications paid for by Drapkin through his related entity, MG TK.

100.    That same day, Drapkin also sold 87,490 shares of China Voice for proceeds of more than $94,000.  Between October 16, 2007, and March 1, 2010, Patera sold more than 8 million shares of China Voice stock for proceeds of more than $6.9

*SEC v. David Ronald Allen, et al.,*
Complaint                           - 19 -

million.  Between October 30, 2007, and April 8, 2008, Drapkin sold more than 2 million

shares for proceeds of more than $2.9 million.

**C.      Patera's Role in Selling Stock on Behalf of China Voice, Allen, and Other Investors**

101.    Between at least July 2006 and June 30, 2010, Patera paid for stock

promotion campaigns, received $1.4 million from China Voice, and sold shares of China

Voice stock on behalf of himself, China Voice, Allen, and other investors, at prices that

markedly increased as the stock promotions commenced.  Patera is not registered as a

securities broker.

102.    Since at least December 2006, Patera has served as a "trustee" or "agent"

for multiple international and domestic investors in China, including two charities, both

with ties to Allen, International Christian Mission ("ICM") and Nations Investment Corp.

("Nations"), which owned millions of shares of China Voice stock.

103.    An agreement between Patera and Allen, signing as Nations' U.S. agent,

included the clause that Nations would reimburse Patera for any "services to increase

investor awareness," which was a reference to campaigns promoting China Voice's

stock.

104.    China Voice did not disclose that its CFO, Allen, had entered into an

agreement to pay for stock promotion campaigns on behalf of a charity with which he

was affiliated that owned millions of shares of China Voice stock.

105.    When international and domestic investors asked Allen for help in

"managing" their China Voice stock, Allen recommended Patera.  As a result, multiple

investors transferred their shares to Patera's control and agreed to pay Patera a

management fee of five percent of the net proceeds, which was defined as the amount received from sales less commissions and fees.

106.    Many investors sent questions about their shares to Allen to pass along to his "broker," meaning Patera.  All of the shares were comingled in accounts controlled by Patera, including millions of shares originally issued in the names of ICM and Nations, the charities with which Allen was involved.

107.    On behalf of these individuals and entities, Patera held, bought, and sold shares of China Voice.

108.    China Voice did not disclose these actions by Patera nor did China Voice disclose that Patera was assisting multiple investors (including two charities with close ties to Allen) to manage their stock.

109.    China Voice subsidized Patera's purchases of company stock.  Between December 27, 2006, and March 1, 2010, Patera and his companies, Third Securities and Capital Bankers Group, Ltd. ("Capital Bankers Group"), purchased more than 6.8 million shares of China Voice.

110.    These stock purchases were preceded by wire transfers, ordered by Allen and Burbank, from China Voice to Patera, which totaled more than $1.4 million.  For example, between March 3 and 5, 2008, China Voice wired $40,000 to Patera, which he immediately moved to a brokerage account he controlled.  During this same time period, this account purchased 50,700 shares of China Voice at a cost of $34,000.  China Voice did not disclose its transfers of funds to Patera.

111.    In addition, Patera hired individuals to buy shares of China Voice. Between June 9, 2008 and August 8, 2008, he paid nearly $100,000 to one of these

individuals. He informed Allen and Burbank of his actions in periodic e-mails, which provided detailed analysis of the stock price, purchases, and volume over the preceding period.

112. Patera sold stock on behalf of China Voice and transferred the proceeds to the company, which it did not disclose these transactions to investors.

113. Between November 6, 2007, and April 8, 2008, Patera transferred more than $450,000 to China Voice. These transfers occurred on multiple occasions and usually followed sales of China Voice stock by brokerage accounts Patera controlled.

114. For example, on October 30, 2007, an account controlled by Patera sold 146,600 shares of China Voice for proceeds of more than $138,000. These sales occurred in the middle of a stock promotion campaign financed by Drapkin. On November 5, 2007, Patera wired $150,000 out of this brokerage account to his personal bank account. The next day, he wired $150,000 from that bank account to China Voice. China Voice did not disclose to investors payments it received from Patera.

**D.     Selective Disclosure of Information**

115. Although China Voice did not inform investors of the developments regarding Flint Telecom discussed in paragraphs 71-86 above, it did keep Patera, a major shareholder, updated privately. On December 17, 2009, Burbank e-mailed Patera about Flint Telecom's efforts to obtain outside financing, telling Patera that it looked like it would happen "on Monday. If that changes I will let you know."

116. Eight days later, Burbank e-mailed Patera telling him that Flint Telecom was still working on the outside financing and that the earliest the company would be able to make payments to China Voice would be January 11, 2010.

117.     In December 2009, Patera controlled over 3.3 million shares of China

Voice.

118.     Allen also engaged in selective disclosure regarding the Flint Telecom

deal.  For example, on April 2, 2010, Allen e-mailed an investor in Great Britain whose

shares were under Patera's control, and informed her that China Voice had suffered

continuous payment delays from Flint Telecom.  Allen told the investor that, as a result,

China Voice had decided to rebuild its domestic subsidiaries and added, "we believe that

we will be able to make some announcements soon and begin to see results in our stock

price.  So our advice to our shareholders is to hold on."

119.     China Voice did not mention the issues with Flint Telecom to other

investors until a press release dated April 8, 2010.  In that release, Burbank stated that

China Voice was rebuilding its U.S. operations because of "fundraising difficulties that

Flint Telecom Group experienced in 2009."  Burbank did not mention that these

"difficulties" had extended into 2010 and that Flint Telecom still owed China Voice $1

million.

**E.      False and Misleading Statements Regarding Loans and Notes**

120.     China Voice relied much more heavily on loans than it disclosed to the

public. The majority of these loans were made or guaranteed by related parties. Yet,

China Voice generally kept such loans largely off of its balance sheet and away from the

eyes of the public.  Some loans have never been disclosed, other loans have been

disclosed but with material omissions and misstatements, while yet others have been

purportedly assigned to Allen-related companies and others, including Drapkin, and thus

do not appear in China Voice's public financial statements.  In exchange for assuming

these debts, Allen-related companies have received preferred shares, yet China Voice has continued to make undisclosed payments on the debts.

121.   For example, in 2007, a China Voice investor residing in Great Britain (the "British creditor") loaned the company a total of $1 million in two transactions. These loans were never publicly disclosed by China Voice.

122.   In a convoluted transaction, Allen's Associates Funding Group then signed a note to the British creditor guaranteeing the loans with 15-18% interest. At the British creditor's request, the note was then converted into preferred stock, but transferred to another Allen-related company. This Allen-related company received a "preferred stock dividend" for these shares, but China Voice paid the "dividend" directly to the British creditor.

123.   While China Voice disclosed that Allen controlled a number of preferred shares, it did not disclose that those shares were related to the British creditor's loan nor did it disclose that China Voice had paid the British creditor at least $438,000 between July 1, 2007, and June 30, 2010, in interest payments and continued to pay the British creditor after the debt had been transferred and assigned to an Allen-related company.

124.   Drapkin and his companies, MG TK and SMI Chips, Inc. ("SMI Chips"), have loaned at least $955,000 to China Voice or its subsidiaries, most of which have never been disclosed by China Voice or were removed from its public disclosures to investors. China Voice agreed to pay Drapkin more than $130,000 in "finders' fees" associated with these loans, fees which were not disclosed to investors.

125.   One of these was a loans for $300,000 that MG TK made to a China Voice subsidiary on March 7, 2007. A year later, China Voice took the loan off its books after

*SEC v. David Ronald Allen, et al.,*
Complaint                    - 24 -

the subsidiary assigned the loan to an Allen-controlled company.  On March 31, 2008,

China Voice issued the Allen-related company 883 preferred shares for assuming this

$300,000 debt.  China Voice's board of directors (which includes Allen and Burbank) set

the preferred stock share price at $1,000.  As a result, the 883 preferred shares issued to

Allen's company were worth $883,000.

126.    However, while assigning the debt to an Allen-related company, China

Voice continued to pay Drapkin's companies for the $300,000 loan from MG TK, as well

as the other loans held by MG TK and SMI Chips.  In the fiscal year ended June 30,

2010, China Voice paid MG TK and SMI Chips at least $300,000.  China Voice did not

disclose these payments to investors.

127.    In addition, as discussed below in Paragraphs 155-161, China Voice has

not disclosed the true amount of "loans" it has received from fraudulent limited

partnerships operated by Allen, Dowlatshahi, and Mills nor has it disclosed the true terms

of these "loans."

## F.    **The Current *Ponzi* Scheme**

128.    On October 29, 2008, China Voice disclosed that it was the subject of a

Securities and Exchange Commission investigation into "the sales of unregistered shares

of stock and representations and publications made in connection therewith."

129.    Approximately two weeks later,  companies controlled by Allen,

Dowlatshahi, and Mills began soliciting investments in a series of at least sixteen

opportunities offered by limited partnerships that Allen controlled: Community of

Pleasant Ridge, Ltd. ("Pleasant Ridge"); Debt Management Associates, Ltd. ("Debt

Management Associates"); D-Cap II Partners, Ltd., D-Cap III Partners Ltd., D-Cap IV

*SEC v. David Ronald Allen, et al.,*
Complaint                                         - 25 -

Partners, Ltd., D-Cap V Partners, Ltd., D-Cap VI Partners, Ltd., D-Cap VII Partners, Ltd., D-Cap VIII Partners, Ltd., D-Cap IX Partners, Ltd., D-Cap X Partners, Ltd., D-Cap XI Partners, Ltd., D-Cap XII Partners, Ltd., D-Cap XIII Partners, Ltd., D-Cap XIV Partners, Ltd., and D-Cap XV Partners, Ltd. (the "D-Cap limited partnerships" and, collectively with Pleasant Ridge and Debt Management Associates the, "limited partnerships").

130. No registration statements were filed with the Commission for these limited partnerships by Allen, Dowlatshahi, Mills or their respective companies nor were any otherwise in effect with respect to these transactions.

131. These investment entities have overlapped in time period and have raised more than $8.6 million in just over two years. The limited partnership offerings are summarized in the table below.

| Name | Offering Amount | Date of First Sale |
|---|---|---|
| Community of Pleasant Ridge Ltd. | $224,000 | 11/14/2008 |
| D-Cap II Partners Ltd. | $250,000 | 1/16/2009 |
| Debt Management Associates Ltd. | $650,000 | 3/26/2009 |
| D-Cap III Partners Ltd. | $250,000 | 5/11/2009 |
| D-Cap IV Partners Ltd. | $600,000 | 9/21/2009 |
| D-Cap V Partners Ltd. | $500,000 | 10/27/2009 |
| D-Cap VI Partners Ltd. | $500,000 | 1/6/2010 |
| D-Cap VII Partners Ltd. | $500,000 | 2/27/2010* |
| D-Cap VIII Partners Ltd. | $1,050,000 | 4/27/2010 |
| D-Cap IX Partners Ltd. | $750,000 | 6/15/2010 |
| D-Cap X Partners Ltd. | $500,000 | 7/29/2010 |
| D-Cap XI Partners Ltd. | $500,000 | 9/15/2010 |
| D-Cap XII Partners Ltd. | $600,000 | 10/19/2010 |
| D-Cap XIII Partners Ltd. | $600,000 | 12/10/2010 |
| D-Cap XIV Partners Ltd. | $600,000 | 12/10/2010 |
| D-Cap XV Partners Ltd. | $600,000 | 2/18/2011 |
| **TOTAL:** | **$8,674,000** | |
| * D-Cap VII's filing with the SEC indicates an initial sale date of 2/27/2007, which, upon information and belief, is a typographical error. | | |

132.    Potential investors are solicited primarily at meetings advertised by

Integrity Driven Network ("IDN"), a self-described "investor networking organization"

that is operated and controlled by Allen, Dowlatshahi, and Mills.  According to

Dowlatshahi in a radio interview featured on IDN's website, IDN has over 350 members

across the country and internationally.

133.    Investors also are solicited through IDN's website, which includes detailed

information about the limited partnerships.  At monthly IDN meetings, attendees are

informed of investment opportunities, including the prior and upcoming limited

partnerships.  They also are advised on how to move their money from Individual

Retirement Accounts ("IRAs") and 401(k)'s into self-directed IRAs, enabling them to

invest in the limited partnerships promoted by Allen, Dowlatshahi, and Mills without

having to consult with a broker.

134.    Investors in the limited partnerships complete a "Suitability

Questionnaire," but Allen, Dowlatshahi, and Mills do not take any steps to verify whether

investors qualify as accredited investors or whether investors can afford to make

investments in the limited partnerships.  In a publicly available radio interview of

Dowlatshahi, IDN's investment opportunities, which include the limited partnerships, are

portrayed as suitable for "everybody," whether they are "seasoned" or "brand-new" to

investing, and whether they are "doctors" or "blue collar" workers.

135.    At IDN meetings and in private placement memoranda ("PPMs")

authorized or disseminated by Allen, Dowlatshahi and Mills, investors are told that the

limited partnerships are managed by a general partner, Development Capital Associates

Joint Venture ("Development Capital") which is comprised of companies controlled by

*SEC v. David Ronald Allen, et al.,*
Complaint                                      - 27 -

Allen, Dowlatshahi, and Mills, including Townhome Communities Corp., Synergetic

Solutions LLC, Lucrative Enterprises Corp., Silver Summit Holdings LLC, and Sleeping

Bear LLC.  In addition, investors are told that Development Capital's principals,

Dowlatshahi, Mills, and especially Allen have experience as "investor advocates,"

financial executives, and asset-based lenders.

136.    Investors in the limited partnerships are not informed that Dowlatshahi

was the subject of a 2006 Desist and Refrain Order by the State of California for his role

in an offering fraud involving unregistered securities in that state.

137.    Allen, Dowlatshahi, and Mills told potential investors in the PPMs, at IDN

meetings, and on the IDN website that they would earn an annual return rate of at least

25%, which would be paid in quarterly installments over the course of a year.  Potential

investors were also told that these investments have "minimal risk."

138.    Allen, Dowlatshahi and Mills, through the PPMs, told potential investors

that $24,000 of every $25,000 invested, would be used to make asset-based loans.

139.    They further advised in the PPMs that "the Partnership will seek out

businesses which have a demonstrated track record…and make high yielding short term

investments in asset based loans, accounts receivable, and/or inventory."

140.    In a featured radio address posted on IDN's website Dowlatshahi

represented that the businesses targeted for investment are "profitable companies, looking

to expand," with "anywhere from a 20 to 25% profit margin," but have been unable to

obtain "traditional financing" because of economic and credit conditions.

141.    Dowlatshahi's radio address also advises potential investors that the asset-

based lending program is "highly selective" about which companies will receive investor

funds and that a "due diligence team" reviews each project. The IDN website tells potential investors that the group receives over 200 proposals per year from businesses looking for asset-based loans from the limited partnerships and that just four are selected to receive investor funds.

142.    These representations are materially false and misleading. Rather than invest the proceeds of the limited partnerships for the stated purpose of making high yielding, short term asset based loans, buying accounts receivable, and/or buying inventory, the vast majority of investor proceeds are used to pay back investors from prior limited partnerships.

143.    In addition, the general partner (Development Capital) and other Allen-related entities have transferred investor funds from later limited partnerships directly, or through Allen-controlled entities such as Development Capital or Associates Funding Group, to the earlier limited partnerships. Once the earlier limited partnerships receive these funds, they use most of the funds to pay back their investors.

144.    The PPMs told investors that their promised rate of return would be generated by the fees and interest paid by these highly profitable, expanding businesses who receive the asset-based loans, as well as potential sales of the debtors' accounts receivable and inventory. The PPMs also told investors that they would receive the 25% (or more) return in four equal, quarterly installments with their principal returned by the end of the year.

145.    The PPMs represent  that the remaining $1,000 of every $25,000 invested, or 4%, would be used to pay "partnership organization costs."

146.    A portion of the limited partnerships' proceeds are provided to businesses, but they are all businesses controlled by Allen. Investors are not provided with the names of the recipients of limited partnership proceeds and therefore have no way of determining the massive conflict of interest on the part of Allen.

147.    In addition, the businesses to which the funds are provided do not have "demonstrated track records." For example, China Voice received at least $1.5 million from the limited partnerships.

148.    Contrary to what investors are told, China Voice is not a profitable company; does not have a 20-25% profit margin; and it does not have an established track record. Rather, China Voice is a company that in the fiscal year ended June 30, 2010 had an operating loss of more than $7.4 million, a net loss of more than $15 million, and an accumulated deficit of more than $46 million according to an SEC filing made by China Voice on March 16, 2011.

149.    Investors in the limited partnerships are not informed that China Voice will be one of the recipients of their proceeds. Investors also are not informed of all of the issues China Voice has had with obtaining payments from Flint Telecom, in implementing its supposed contracts in China, its reliance on undisclosed loans, and that it is under investigation by the Commission.

150.    Some of the remaining funds from the limited partnerships are used to make payments to Allen, Dowlatshahi, Mills, and their affiliated companies. These payments total more than the 10% of total proceeds that investors were told will go toward management fees.

151.    Dowlatshahi has received payments from the limited partnerships through his companies Darius Assets Holding Corp., Lucrative Enterprises Corp., and Synergetic Solutions LLC.

152.    Mills has received payments from the limited partnerships through his companies Silver Summit Holdings LLC and Sleeping Bear LLC.

153.    Allen has received payments through his companies Associates Funding Group and Winterstone Financial Ltd. ("Winterstone").

154.    In addition, Associates Funding Group and Winterstone have received limited partnership proceeds that have been filtered through other Allen-related companies, including China Voice.  Limited partnership proceeds that reach Winterstone are then transferred to Allen's wife, Patricia Allen, in the form of checks.  At least $275,000 in checks have been written to Ms. Allen from Allen-related companies such as Winterstone since the limited partnerships began in November 2008.

155.    China Voice, while receiving funds from the limited partnerships, has not disclosed the true terms of the "loans" it has received.  In China Voice's quarterly financial report for the quarter ended March 31, 2010, China Voice disclosed that it had received $1,239,100 from certain "investment entities controlled by a related party with interest at 18%."  Allen has admitted that due to a "consulting" element (i.e., the "use of the money"), the actual interest rate was closer to 30%.  However, investors in China Voice have not been informed of this exorbitant rate.

156.    Contrary to the statements made to limited partnership investors that their money would be used to help profitable, proven businesses grow, China Voice has not used investor money to expand its business.

157.   Instead, the company is using a significant portion of the proceeds it does receive from the limited partnerships to pay MG TK and SMI Chips, companies controlled by the stock promoter, Drapkin, as discussed above.  These payments, and the underlying loans, were not disclosed by China Voice to investors.

158.   In its annual report for the fiscal year ended June 30, 2010, China Voice claimed that it had paid back hundreds of thousands of dollars in "loans" and now owed just $782,000, again asserting that the interest rate was 18%.

159.   However, in August 2010, Allen admitted that China Voice had made interest payments on the loans from the D-Cap limited partnerships but had not paid back principal and that the total amount China Voice owed the D-Cap limited partnerships had risen to $1.5 million.  In filing the quarterly financial report for the quarter ended September 30, 2010, China Voice claimed that the amount owed was just $59,000, again with only an 18% interest rate.

160.   China Voice received funds from later limited partnerships that have not been disclosed, including at least $339,000 in the quarter ended September 30, 2010. China Voice has paid down the "loans" from the earlier limited partnerships, claiming that its debt to the "investment entities" is now just $59,000, failing to account for the new funds flowing into China Voice from the later limited partnerships.

161.   D-Cap XV began soliciting investors in February 2011.  Upon information and belief, Allen, Dowlatshahi, and Mills have begun preparations for at least two more limited partnerships (D-Cap XVI Partners, Ltd. and D-Cap XVII Partners, Ltd.) and may have begun soliciting investors for them.  The next IDN meeting is scheduled for May 4, 2011.

## G.     The NTELEC Transaction

162.    On April 21, 2011, China Voice announced for the first time that it had signed an agreement, effective as of October 1, 2010, to acquire 100% of the outstanding stock of NTELEC Networks, LLC ("NTELEC"). As part of the acquisition, NTELEC's President has become China Voice's new CEO, and a new CFO was announced, as well. Effective April 15, 2011, Allen and Burbank resigned their positions from China Voice.

**CLAIMS**

**FIRST CLAIM**

**Violations of Section 5(a) and 5(c) of the Securities Act**

163.    The Commission repeats and incorporates Paragraphs 1 through 162 of this Complaint by reference as if set forth *verbatim.*

164.    Defendants Allen, Dowlatshahi, Mills, Development Capital, Lucrative Enterprises, Silver Summit, Sleeping Bear, Synergetic Solutions, and Townhome Communities, directly or indirectly, singly and in concert with others, have been offering to sell, selling, and delivering after sale, certain securities, and have been, directly and indirectly: (a) making use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell securities, through the use of written contracts, offering documents, and otherwise: (b) carrying and causing to be carried through the mails and interstate commerce by the means and instruments of transportation, such securities for the purpose of sale and for delivery after sale; and (c) making use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell such securities.

165.    As described in Paragraphs 1, 3-5 and 128-161 (ponzi), Defendants Allen, Dowlatshahi, Mills, Development Capital, Lucrative Enterprises, Silver Summit, Sleeping Bear, Synergetic Solutions, and Townhome Communities offered and sold securities to the public through a general solicitation of investors.

166.    No registration statementwas ever filed with the Commission or otherwise in effect with respect to the offer and sale of these securities.

167.    By reason of the foregoing, Defendants Allen, Dowlatshahi, Mills, Development Capital, Lucrative Enterprises, Silver Summit, Sleeping Bear, Synergetic Solutions, and Townhome Communities have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM

### Violations of Section 17(a)(1) of the Securities Act

168.    The Commission repeats and incorporates paragraphs 1 through 167 of this Complaint by reference as if set forth *verbatim.*

169.    Defendants Allen, Burbank, Dowlatshahi, Drapkin, Mills, Patera, China Voice, Development Capital, Lucrative Enterprises, Silver Summit Holdings, Sleeping Bear, Synergetic Solutions, and Townhome Communities Corp., directly or indirectly, singly or in concert with others, in connection with the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails, have employed devices, schemes, and artifices to defraud.

170.    As part of and in furtherance of their fraudulent scheme, Defendants Allen, Burbank, and China Voice, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other

*SEC v. David Ronald Allen, et al.,*
Complaint                                    - 34 -

correspondence, oral presentations, press releases and/or other public documents, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to those set forth in Paragraphs 1-2, 55-86, 120-127 and 155-161 (misrepresentations and omissions) above.

171.    As part of and in furtherance of their scheme, Defendants Drapkin and Patera, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, oral presentations, press releases and/or other public documents, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to those set forth in Paragraphs 87-119 (stock promotions) above.

172.    As part of and in furtherance of their scheme, Defendants Allen, Dowlatshahi, Mills, Development Capital, Lucrative Enterprises, Silver Summit Holdings, Sleeping Bear, Synergetic Solutions, and Townhome Communities, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, oral presentations, press releases and/or other public documents, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading, including but not limited to those set forth in

Paragraphs 1, 3-5 and 128-161(ponzi) above.

173.    Defendants Allen, Burbank, Dowlatshahi, Drapkin, Mills, Patera, China

Voice, Development Capital, Lucrative Enterprises, Silver Summit Holdings, Sleeping

Bear, Synergetic Solutions, and Townhome Communities Corp., engaged in the conduct

alleged herein knowingly or recklessly.

174.    By reason of the foregoing, Defendants Allen, Burbank, Dowlatshahi,

Drapkin, Mills, Patera, China Voice, Development Capital, Lucrative Enterprises, Silver

Summit Holdings, Sleeping Bear, Synergetic Solutions, and Townhome Communities

Corp., have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the

Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM

### Violations of Section 17(a)(2) and (3) of the Securities Act

175.    The Commission repeats and incorporates paragraphs 1 through 174of this

Complaint by reference as if set forth *verbatim.*

176.    Defendants Allen, Burbank, Dowlatshahi, Drapkin, Mills, Patera, China

Voice, Development Capital, Lucrative Enterprises, Silver Summit Holdings, Sleeping

Bear, Synergetic Solutions, and Townhome Communities Corp., directly or indirectly,

singly or in concert with others, in connection with the offer or sale of securities, by use

of the means and instrumentalities of interstate commerce and by use of the mails, have

made untrue statements of material facts and omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were

made, not misleading; and engaged in acts, practices, and courses of business which

operate as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

177.   As part of and in furtherance of their fraudulent scheme, Defendants

Allen, Burbank, and China Voice, directly and indirectly, prepared, disseminated or used

contracts, written offering documents, promotional materials, investor and other

correspondence, oral presentations, press releases and/or other public documents, which

contained untrue statements of material facts and misrepresentations of material facts,

and which omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading, including but

not limited to those set forth in Paragraphs 1-2, 55-86, 120-127 and 155-161

(misrepresentations and omissions) above.

178.   As part of and in furtherance of their fraudulent scheme, Defendants

Drapkin and Patera directly and indirectly, prepared, disseminated or used contracts,

written offering documents, promotional materials, investor and other correspondence,

oral presentations, press releases and/or other public documents, which contained untrue

statements of material facts and misrepresentations of material facts, and which omitted

to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading, including but not limited to

those set forth in Paragraphs 87-119 (stock promotions) above.

179.   As part of and in furtherance of their fraudulent scheme, Defendants

Allen, Dowlatshahi, Mills, Development Capital, Lucrative Enterprises, Silver Summit

Holdings, Sleeping Bear, Synergetic Solutions, and Townhome Communities, directly

and indirectly, prepared, disseminated or used contracts, written offering documents,

promotional materials, investor and other correspondence, oral presentations, press releases and/or other public documents, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to those set forth in Paragraphs 1, 3-5 and 128-161 (ponzi) above.

180.   Defendants Allen, Burbank, Dowlatshahi, Drapkin, Mills, Patera, China Voice, Development Capital, Lucrative Enterprises, Silver Summit Holdings, Sleeping Bear, Synergetic Solutions, and Townhome Communities Corp., acted at least negligently with respect to their actions alleged herein.

181.   By reason of the foregoing, Defendants Allen, Burbank,  Dowlatshahi, Drapkin, Mills, Patera, China Voice, Development Capital Joint Venture, Lucrative Enterprises, Silver Summit Holdings, Sleeping Bear, Synergetic Solutions, and Townhome Communities Corp., have violated and, unless enjoined, will continue to violate Section 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM

### Violations of Section 17(b) of the Securities Act

182.   The Commission repeats and incorporates Paragraphs 1 through 181 of this Complaint by reference as if set forth *verbatim*.

183.   Defendants Wilson and Strategic Capital, directly or indirectly, singly or in concert with others, by use of the means and instrumentalities of transportation or communication in interstate commerce or by the use of the mails, published, gave publicity to, or circulated a communication which, though not purporting to offer a

*SEC v. David Ronald Allen, et al.,*
Complaint                                                    - 38 -

security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

184.    As part of and in furtherance of their scheme, Defendants Wilson and Strategic Capital, directly or indirectly, published blast faxes concerning China Voice in exchange for consideration and did not fully disclose the past or future receipt of such consideration and the amounts.

185.    By reason of the foregoing, Defendants Wilson and Strategic Capital have violated and, unless enjoined, will continue to violate Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

**FIFTH CLAIM**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

186.    The Commission repeats and incorporates paragraphs 1 through 185 of this Complaint by reference as if set forth *verbatim*.

187.    Defendants Allen, Burbank, Dowlatshahi, Drapkin, Mills, Patera, Wilson, China Voice, Development Capital, Lucrative Enterprises, Silver Summit Holdings, Sleeping Bear, Strategic Capital, Synergetic Solutions, and Townhome Communities Corp., directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of

business which operate as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

188.    As part of and in furtherance of their fraudulent scheme, Defendants Allen, Burbank, and China Voice, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, oral presentations, press releases, and/or other public documents, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to, those set forth in Paragraphs 1-2, 55-86, 120-127 and 155-161 (misrepresentations and omissions)  above.

189.    As part of and in furtherance of their fraudulent scheme, Defendants Drapkin, Patera, Wilson, and Strategic Capital, directly and indirectly, prepared, disseminated or used contracts, written offering documents, promotional materials, investor and other correspondence, oral presentations, press releases, and/or other public documents, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to, those set forth in Paragraphs 87-119(stock promotions) above.

190.    As part of and in furtherance of their fraudulent scheme, Defendants Allen, Dowlatshahi, Mills, Development Capital, Lucrative Enterprises, Silver Summit Holdings, Sleeping Bear, Synergetic Solutions, and Townhome Communities, directly

and indirectly, prepared, disseminated or used contracts, written offering documents,

promotional materials, investor and other correspondence, oral presentations, press

releases, and/or other public documents, which contained untrue statements of material

facts and misrepresentations of material facts, and which omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading, including but not limited to, those set forth in

Paragraphs 1, 3-5 and 128-161 (ponzi) above.

191.    Defendants Allen, Burbank, Dowlatshahi, Drapkin, Mills, Patera, Wilson,

China Voice, Development Capital, Lucrative Enterprises, Silver Summit Holdings,

Sleeping Bear, Strategic Capital, Synergetic Solutions, and Townhome Communities

Corp., made the above-referenced misrepresentations and omissions knowingly or

recklessly.

192.    By reason of the foregoing, Defendants Allen, Burbank, Dowlatshahi,

Drapkin, Mills, Patera, Wilson, China Voice, Development Capital, Lucrative

Enterprises, Silver Summit Holdings, Sleeping Bear, Strategic Capital, Synergetic

Solutions, and Townhome Communities Corp., have violated and, unless enjoined, will

continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-

thereunder [17 C.F.R. §240.10b-5].

## SIXTH CLAIM

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10(b)-5

193.    The Commission repeats and incorporates paragraphs 1 through 192 of this Complaint by reference as if set forth *verbatim.*

194.    Defendants Associates Funding Group, Capital Bankers Group, IDN, MG TK, and Third Securities Group, knowingly or with severe recklessness, provided substantial assistance to Defendants Allen, Dowlatshahi, Drapkin, Mills, Patera, Development Capital, Lucrative Enterprises, Silver Summit Holdings, Sleeping Bear, Synergetic Solutions, and Townhome Communities Corp.'s violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

195.    By reason of the foregoing, Defendants Associates Funding Group, Capital Bankers Group, IDN, MG TK, and Third Securities Group aided and abetted Defendants Allen, Dowlatshahi, Drapkin, Mills, Patera, Development Capital, Lucrative Enterprises, Silver Summit Holdings, Sleeping Bear, Synergetic Solutions, and Townhome Communities Corp.'s violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and, unless enjoined, are reasonably likely to continue to aid and abet violations of Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## SEVENTH CLAIM

### Violations of Section 13(a) of the Exchange Act and Regulation FD

196.    The Commission repeats and incorporates paragraphs 1 through 195 of this Complaint by reference as if set forth *verbatim.*

*SEC v. David Ronald Allen, et al.,*
Complaint                                    - 42 -

197.     Regulation FD requires that when an issuer, or anyone acting on its behalf, discloses material, nonpublic information to persons outside the issuer, it must simultaneously disclose such information to the public. Where the issuer knows or is reckless in not knowing that the information it is communicating is both material and nonpublic, the unlawful selective disclosure is intentional within the meaning of Regulation FD.

198.     In addition, Regulation FD creates reporting duties for issuers pursuant to Section 13(a) of the Exchange Act.  If an issuer violates Regulation FD by making selective disclosure without making a simultaneous public disclosure of that information, the issuer also violates Section 13(a).

199.     Defendants Allen and Burbank, acting on behalf of China Voice, disclosed material, nonpublic information to Patera and others without making simultaneous disclosure of that information to the public.

200.     Accordingly, China Voice violated and, unless enjoined, will continue to violate Regulation FD [17 C.F.R. § 243.100, *et seq.*] and China Voice violated, and unless enjoined will continue to violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)].

## EIGHTH CLAIM

### Aiding and Abetting Violations of Section 13(a) of the Exchange Act and Regulation FD

201.     The Commission repeats and realleges Paragraphs 1 through 200 of this Compalint and incorporated herein by reference as if set forth *verbatim.*

*SEC v. David Ronald Allen, et al.,*
Complaint                              - 43 -

202.     Defendants Allen and Burbank, knowingly or with severe recklessness,

provided substantial assistance to Defendant China Voice's violations of Section 13(a) of

the Exchange Act and Regulation FD.

203.     By reason of the foregoing, Defendants Allen and Burbank violated and,

unless enjoined, will continue to violate Section 13(a) of the Exchange Act [15 U.S.C. §

78m(a)] and Regulation FD [17 C.F.R. § 243.100, *et seq.*].

### NINTH CLAIM

### Violations of Section 15(a) of the Exchange Act

204.     The Commission repeats and incorporates paragraphs 1 through 203 of

this Complaint by reference as if set forth *verbatim.*

205.     Defendant Patera, directly or indirectly, singly or in concert, made use of

the mails or means or instrumentalities of interstate commerce to effect transactions in, or

to induce or attempt to induce the purchase or sale of securities, without being registered

as a broker or dealer or being associated with a registered broker or dealer.

206.     As part of and in furtherance of his scheme, Defendant Patera regularly

promoted China Voice stock and his ability to arrange for sales of such stock on behalf of

investors.  Defendant Patera also received compensation based on his sales of China

Voice stock.  While engaged in this conduct, Defendant Patera was not registered as a

broker or associated with a registered broker or dealer.

207.     By reason of the foregoing, Defendant Patera has violated and, unless

enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## TENTH CLAIM

### Aiding and Abetting Violations of Section 15(a) of the Exchange Act

208.    The Commission repeats and incorporates paragraphs 1 through 207 of this Complaint by reference as if set forth *verbatim*.

209.    Defendant Allen, knowingly or with severe recklessness, provided substantial assistance to Defendant Patera's violations of Section 15(a) of the Exchange Act.

210.    By reason of the foregoing, Defendant Allen has violated and, unless enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## ELEVENTH CLAIM

### Control Person Liability Under Section 20(a) of the Exchange Act

211.    The Commission repeats and incorporates paragraphs 1 through 210 of this Complaint  by reference as if set forth *verbatim*.

212.    At all times relevant to the allegations in this Complaint, Allen controlled Associates Finding Group, China Voice Holding Corp., Development Capital Associates Joint Venture, Integrity Driven Network, and Townhome Communities Corp.

213.    By reason of the foregoing, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Allen is jointly and severally liable with, and to the same extent as, the entities he controlled for violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

214.    At all times relevant to the allegations in this Complaint, Burbank controlled China Voice Holding Corp.

215. By reason of the foregoing, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Burbank is jointly and severally liable with, and to the same extent as, the entity he controlled for violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

216. At all times relevant to the allegations in this Complaint, Dowlatshahi controlled Development Capital Associates Joint Venture, Integrity Driven Network, Lucrative Enterprises, Corp., and Synergetic Solutions, LLC.

217. By reason of the foregoing, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Dowlatshahi is jointly and severally liable with, and to the same extent as, the entities he controlled for violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

218. At all times relevant to the allegations in this Complaint, Drapkin controlled MG TK Corp.

219. By reason of the foregoing, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Drapkin is jointly and severally liable with, and to the same extent as, the entity he controlled for violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

220. At all times relevant to the allegations in this Complaint, Mills controlled Development Capital Associates Joint Venture, Silver Summit Holdings, LLC, and Sleeping Bear, LLC.

221. By reason of the foregoing, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Mills is jointly and severally liable with, and to the same extent

as, the entities he controlled for violations of Section 10(b) of the Exchange Act [15

U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

222.    At all times relevant to the allegations in this Complaint, Patera controlled

Capital Bankers Group, Ltd. and Third Securities Corp.

223.    By reason of the foregoing, and pursuant to Section 20(a) of the Exchange

Act [15 U.S.C. § 78t(a)], Patera is jointly and severally liable with, and to the same extent

as, the entity he controlled for violations of Section 10(b) of the Exchange Act [15 U.S.C.

§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

224.    At all times relevant to the allegations in this Complaint, Wilson

controlled Strategic Capital.

225.    By reason of the foregoing, and pursuant to Section 20(a) of the Exchange

Act [15 U.S.C. § 78t(a)], Wilson is jointly and severally liable with, and to the same

extent as, the entity he controlled for violations of Section 10(b) of the Exchange Act [15

U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## TWELFTH CLAIM

### Claim Against the Relief Defendants as Custodians of Investor Funds

226.    The Commission repeats and incorporates paragraphs 1 through 225 of

this Complaint by reference as if set forth *verbatim.*

227.    As set forth above Relief Defendants Patricia Allen, Community of

Pleasant Ridge, Ltd., Darius Assets Holding Corp., Debt Management Associates, Ltd.,

D-Cap II Partners, Ltd., D-Cap III Partners, Ltd., D-Cap IV Partners, Ltd., D-Cap V

Partners, Ltd., D-Cap VI Partners, Ltd., D-Cap VII Partners, Ltd., D-Cap VIII Partners,

Ltd., D-Cap IX Partners, Ltd., D-Cap X Partners, Ltd., D-Cap XI Partners, Ltd., D-Cap

XII Partners, Ltd., D-Cap XIII Partners, Ltd., D-Cap XIV Partners, Ltd., D-Cap XV

Partners, Ltd., D-Cap XVI Partners, Ltd., D-Cap XVII Partners, Ltd., Green Horseshoe

Holdings, Inc., SMI Chips, Inc., and Winterstone Financial, Ltd. have received funds and

property from one or more of the Defendants, which are the proceeds, or are traceable to

the proceeds, of the unlawful activities of the Defendants.

228.    Relief Defendants have obtained the funds and property alleged above

under circumstances in which it is not just, equitable, or conscionable for them to retain

the funds and property to which they have no legitimate claim.  As a consequence, Relief

Defendants have been unjustly enriched.

## RELIEF REQUESTED

The Commission seeks the following relief:

229.    An order of the Court temporarily, preliminarily, and permanently

enjoining Defendants, as appropriate, their agents, servants, employees, attorneys, and all

persons in active concert or participation with them who receive actual notice of the

injunction by personal service or otherwise, and each of them, from future violations of

Sections 5(a), 5(c), 17(a), and 17(b) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c),

77a(a), and 77q(b)] and Sections 10(b), 13(a), 15(a), and 20(a) of the Exchange Act [15

U.S.C. §§ 78j(b), 78m(a), 78o(a), and 78t(a)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

and Regulation FD [17 C.F.R. § 243.100 *et seq.*] thereunder.

230.    An order of the Court temporarily and preliminarily enjoining Defendants

Allen, Dowlatshahi, Mills, Development Capital, Lucrative Enterprises, Silver Summit

Holdings, Sleeping Bear, Synergetic Solutions, Townhome Communities, Associates

Funding Group, and IDN from the further solicitation, offer, or sale of unregistered

securities in the form of investments in limited partnerships and from further participation as the general partner of such limited partnerships.

231.    An order of the Court directing Defendants and Relief Defendants to disgorge an amount equal to the funds and benefits obtained illegally as a result of the violations alleged, plus prejudgment interest on that amount.

232.    An order of the Court directing Defendants to pay civil monetary penalties in an amount determined as appropriate by the Court pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] for their violations of the federal securities laws as alleged herein.

233.    An order of the Court barring Defendants Allen, Burbank, Drapkin, Patera, and Wilson from participating in any penny stock offering pursuant to Section 20(g) of the Securities Act [15 U.S.C. §78t(g)] and Section 21(d)(6) of the Securities Act [15 U.S.C. §77u(d)(6)].

234.    An order of the Court barring Defendants Allen and Burbank from serving as an officer or director of any public company under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

235.   All further relief as the Court may deem just and proper.

Dated:  April 28, 2011                    Respectfully submitted,


Toby M. Galloway                          Jane M.E. Peterson (MN Bar No. 0185036)
Texas Bar No. 00790733                    Stephen L. Cohen
Securities and Exchange Commission        Jennifer Leete
Burnett Plaza, Suite 1900                 Carolyn M. Welshhans
801 Cherry Street, Unit 18                David R. Herman
Fort Worth, TX 76102                      Securities and Exchange Commission
(817) 978-6447                            100 F Street, N.E.
(817) 978-2700 (fax)                      Washington, D.C. 20549
                                          (202) 551-4468 (Peterson)
Local Counsel                             (202) 772-9245 (Fax Peterson)
                                          petersonjme@sec.gov

                                          Attorneys for Plaintiff
                                          Securities and Exchange Commission

JS 44 (TXND Rev. 2/10)

**CIVIL COVER SHEET** 3 1 1 C V - 8 8 2 - 0

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

U.S. SECURITIES AND EXCHANGE COMMISSION

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Jane M.E. Peterson, U.S. SEC, 100 F Street, NE,
Washington, DC 20549  Ph: (202)551-4468

**DEFENDANTS**

DAVID RONALD ALLEN et al

RECEIVED
APR 28 2011   DALLAS

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

Attorneys (If Known)
Spencer C. Barasch, ESQ., Andrews Kurth LLP, 1717 Main Street,
Suite 3700, Dallas, TX 75201  Ph: (214)659-4685

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☒ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
5(a) & 5(c) [15 U.S.C. § 77e(a) & 77e(c)], 17(a)(1) [15 U.S.C. § 77q(a)], 17(a)(2) & (a)(3) [15 U.S.C. § 77q(a)]
Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) PENDING OR CLOSED:** (See instructions)
JUDGE _____  DOCKET NUMBER _____

DATE 04/28/2011
SIGNATURE OF ATTORNEY OF RECORD _Jane M Peterson_

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____